UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA WALKER | ) | CASE NO. 1:13CV2298 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Paula Walker Disability Insurance Benefits (DIB). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his August 21, 2012 decision in finding that Plaintiff was not disabled because she could perform a limited range of unskilled sedentary work (Tr. 20-32). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

## I.  PROCEDURAL HISTORY

Plaintiff, Paula Walker, filed her application for DIB on October 22, 2010, alleging she became disabled on September 9, 2006 (Tr. 225-226), but amended her onset date at the hearing to November 4, 2009 (Tr. 43, 90-103). Plaintiff's application was denied initially and on reconsideration (Tr. 138-146, 148-154). Plaintiff requested a hearing before an ALJ, and, on July

1

3, 2012, a hearing was held where Plaintiff appeared with counsel and testified before an ALJ, and a vocational expert also testified (Tr. 38-89).

On August 21, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 20-32). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-3). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g).

## II. STATEMENT OF FACTS

Plaintiff was born on December 12, 1962, completed the ninth grade, and had a work history as a housekeeper, sander, and greeter (Tr. 225, 243, 244). She has not worked since September 2006, allegedly due to back and leg injuries, memory loss, and dizziness due to head trauma, a learning disability, and depression (Tr. 242).

## III. SUMMARY OF MEDICAL EVIDENCE

A. Physical Impairments

On November 19, 2009, February 16, 2010, May 13, 2010, and August 10, 2010, Plaintiff reported to Bruce A. Piszel, M.D., of Seeds Orthopedics, that she was experiencing lower back pain that radiated to her legs, but her pain with medication was no higher than a three on a ten-point scale (Tr. 388, 391, 394, 397). On August 10, 2010, Plaintiff reported seventy-five percent relief with her current regimen without side effects (Tr. 399). She was not using a cane or walker (Tr. 388, 391, 394, 398). Dr. Piszel's examinations showed no cyanosis or edema, no clubbing, and full and equal pulses (Tr. 389, 392, 395). Dr. Piszel determined that Plaintiff's condition was stable, and he refilled her

Oxycontin and Percocet prescriptions (Tr. 390, 393, 396, 399).

On August 25, 2010, Plaintiff went to see Neil Cherian, M.D., of The Center for Headache and Pain, reporting neck and left leg pain, dizziness, and headaches (Tr. 340, 349). Dr. Cherian stated that Plaintiff had some reduced cervical spine range of motion, but he observed no pain behaviors, her gait was normal, and her shoulders exhibited full strength (Tr. 340-341). Dr. Cherian felt that no further testing was needed, that Plaintiff should continue her home neck exercises, and he prescribed Neurontin for her occipital nerve irrigation and migraines (Tr. 349).

On October 10, 2010, Plaintiff continued to report to Dr. Piszel that she experienced lower back pain with radiation to her legs, but her pain level was only a two at the most with medication (Tr. 415). Plaintiff reported seventh-five percent relief with her current regimen without side effects (Tr. 417). She was not using a cane or walker (Tr. 415). Dr. Piszel's examination showed only a mildly positive straight leg raise test, full and equal pulses, no cyanosis or edema, and no clubbing (Tr. 416). Dr. Piszel determined that Plaintiff's condition was stable, and he refilled her Oxycontin and Percocet prescriptions (Tr. 417).

On December 1, 2010, Plaintiff reported to Dr. Piszel that her back and leg pain was a five on a ten-point scale (Tr. 400). Plaintiff was not using a cane or walker (Tr. 400). Dr. Piszel's examination showed full and equal pulses, no cyanosis or edema, and no clubbing (Tr. 401). Dr. Piszel determined that Plaintiff's condition was stable, and he refilled Plaintiff's Oxycontin and Percocet prescriptions (Tr. 402).

On March 2, 2011, Plaintiff reported to Dr. Piszel that her back and leg pain was a seven on a ten-point scale (Tr. 433). She was not using a cane or walker (Tr. 433). Dr. Piszel's examinations showed no cyanosis or edema, moderately positive straight leg raise test, normal sensation, full and equal pulses, and no clubbing (Tr. 434). Dr. Piszel increased her medication dosage because Plaintiff

3

reported less than twenty-five percent relief (Tr. 435).

On December 27, 2010, state agency medical consultant Willa Caldwell, M.D. conducted a Physical Residual Functional Capacity (RFC) Assessment.  Dr. Caldwell concluded that Plaintiff could frequently lift/carry ten pounds, stand/walk two hours, and sit six hours in an eight-hour workday, and she had unlimited pushing/pulling abilities (Tr. 117).  Plaintiff could occasionally climb ramps/stairs, stoop, crouch, and kneel, and should never balance or crawl (Tr. 117-118).  On June 7, 2011, Teresita Cruz, M.D. conducted another RFC assessment, and reached the same conclusions as Dr. Caldwell (Tr. 132-133).

On May 7, 2012, Dr. Piszel completed a medical source statement.  He concluded that Plaintiff could lift/carry ten pounds occasionally and five pounds frequently (Tr. 476).  Plaintiff could stand/walk one hour and sit one hour in an eight-hour workday (Tr. 476).  Plaintiff also could never climb, balance, stoop, crouch, kneel, crawl, and push/pull, but could occasionally reach and frequently handle, feel, and manipulate (Tr. 476-477).  Dr. Piszel indicated that Plaintiff was not currently using a cane, walker, brace, or TENS unit (Tr. 477).

B.     <u>Mental Impairments</u>

On June 15, 2009, Plaintiff reported to Nabila Sargious, M.D. that she was compliant with her medication, and was doing "okay," despite financial stressors (Tr. 331).  Dr. Sargious' examination showed that Plaintiff had a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (Tr. 331).

On September 21, 2009, Plaintiff reported to Dr. Sargious that she was compliant with her medication (Tr. 330).  She was a "little more depressed," because she might have to file for bankruptcy, and she was at risk of losing the baby that she was seeking to adopt (Tr. 330).  Dr. Sargious' examination revealed that Plaintiff's affect was constricted, and she had "passive death

4

wishes," but she denied suicidal thoughts, she was fully oriented, and her insight and judgment were fair (Tr. 330).

On October 5, 2009, Dr. Sargious saw Plaintiff for an emergency appointment, because Plaintiff ran out of medication ten days ago (Tr. 329). Plaintiff expressed suicidal thoughts and increased hopelessness (Tr. 329). Dr. Sargious refilled Plaintiff's medication (Tr. 329).

On December 7, 2009, Plaintiff reported that she was compliant with her medication, was "ok now," and "everything has been fine" (Tr. 328). She reported some daily depression, but mostly of a mild and short duration (Tr. 328). She was looking forward to adopting the baby that she fostered (Tr. 328). Dr. Sargious' examination showed that Plaintiff had a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (Tr. 328).

On March 3, 2010 and May 26, 2010, Plaintiff denied depression symptoms, and her anxiety was controlled (Tr. 326, 327). She reported good sleep, energy, and motivation (Tr. 326). She was in the process of finalizing one adoption, and was also fostering the girl's baby sister (Tr. 326). Dr. Sargious' examinations showed that Plaintiff had a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (Tr. 326, 327).

On August 18, 2010, Plaintiff reported to Dr. Sargious that she was having a rough time adjusting to moving and having another baby, but she was complaint with her medication, and was doing "ok" (Tr. 325). Dr. Sargious' examination showed that Plaintiff had a fair mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (Tr. 325).

5

On November 17, 2010, Plaintiff reported, "I'm all right" (Tr. 369).  Although she reported increased stress from moving, Dr. Sargious' examination showed that Plaintiff had a fair mood, constricted affect, coherent and spontaneous speech, adequate insight and judgment, fair impulse control, and no overt psychosis or suicidal thoughts (Tr. 369).

On February 16, 2011 and March 9, 2011, Plaintiff reported that she was compliant with her medication, and, although she reported increased stress related to the adoptions and financial issues, she reported feeling "okay," with no increases in her depression or anxiety (Tr. 436, 437).  She also reported good sleep, energy, and motivation, and she was able to care for her adopted daughters (Tr. 436, 437).  Dr. Sargious' examination showed that Plaintiff had a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, fair impulse control, and no overt psychosis or suicidal thoughts (Tr. 436, 437).

On May 9, 2011, Plaintiff reported that she was tired a lot, but denied depression symptoms, stating that "I want to get out and do things" (Tr. 441).  Dr. Sargious' examination showed that Plaintiff had a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (Tr. 441).

On August 8, 2011, Plaintiff denied depression symptoms and increased anxiety (Tr. 468). She reported that she was "doing okay," and "nothing has been bothering [her]" (Tr. 468). Dr. Sargious' examination showed that Plaintiff had a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (Tr. 468).

On November 17, 2011 and January 30, 2012, Plaintiff reported increased stress, but she was doing "ok" (Tr. 474, 475).  Plaintiff reported to Dr. Sargious that her older daughter was moving (Tr. 474).  Dr. Sargious' examinations showed that Plaintiff had a stable mood, reactive affect, coherent

and spontaneous speech, goal-directed thoughts, adequate insight and judgment, adequate impulse control, and no overt psychosis or suicidal thoughts (Tr. 465, 474).

On April 23, 2012, Plaintiff reported that she was doing "ok" mentally, but her physical impairments made it difficult for her to care for the children or go places (Tr. 473). Dr. Sargious' examination showed that Plaintiff had a fair mood, constrictive affect, coherent and spontaneous speech, goal-directed thoughts, adequate insight and judgment, fair impulse control, and no overt psychosis or suicidal thoughts (Tr. 468).

  C.  Medical Opinions and RFC Assessments

On December 13, 2010, Dr. Sargious completed a check-box medical source statement. He indicated that in making occupational adjustments, Plaintiff was poor at maintaining attention for extended periods and maintaining regular attendance, but was at least fair at following work rules, using judgment, responding appropriately to changes, dealing with the public, relating to co-workers, interacting with supervisors, functioning independently without supervision, working in coordination with others, dealing with work stresses, and completing a workday and workweek without psychologically-based interruptions (Tr. 404). In intellectual functioning, Dr. Sargious indicated that Plaintiff was at least fair at understanding, remembering, and carrying out complex, detailed, and simple job instructions (Tr. 405). In making personal and social adjustments, Plaintiff was fair to good at maintaining her appearance, socializing, behaving in an emotionally stable manner, relating predictably in social situations, managing funds/schedules, and leaving home on her own (Tr. 405). However, Dr. Sargious stated she has "mood disorder with depression [and] symptoms of [increased] anxiety (Tr. 405).

On February 23, 2011, psychologist Donald Degli, M.A. evaluated Plaintiff at the state agency's request. Plaintiff reported that she took anti-depressants and checked in with her psychiatrist

every three months for medication purposes (Tr. 408). She had never been to an inpatient psychiatrist unit (Tr. 408). Dr Degli's examination revealed that Plaintiff was "vegetating in her daily functioning, depressed" and socially withdrawn, but she had normal conversation and thought flow, full orientation, and no attention difficulties (Tr. 408-409). Although Plaintiff reported learning difficulties, and Dr. Degli found that she had an intellectual deficiency, Dr. Degli found that they were not of "clinical significance," as she was able to hold gainful employment for years and she has met child-rearing responsibilities (Tr. 409). In terms of daily living activities, although Plaintiff stated that she spent much of her day watching television, she reported that she drove, managed the household, and did the shopping (Tr. 409). Dr. Degli concluded that Plaintiff was markedly impaired in social interaction; following directions or doing routine tasks; maintaining concentration, persistence, and pace; and withstanding stresses (Tr. 410).

On March 11, 2011, David Dietz, Ph.D. conducted a Mental RFC Assessment, and adopted the RFC finding from the previous ALJ decision (Tr, 118). The ALJ in the previous decision found that Plaintiff could have occasional contact with co-workers, supervisors, and the public (Tr. 98, Finding No. 5). In addition, the ALJ limited her to only simple, routine, repetitive, one- or two-step tasks that were not performed in a fast-paced environment and involved relatively few workplace changes (Tr. 98, Finding No. 5). On June 7, 2011, medical consultant Aracelis Rivera, Psy.D. conducted another Mental RFC Assessment, and reached the same conclusions as Dr. Dietz and the previous ALJ (Tr. 132).

On April 23, 2012, Dr. Sargious submitted a similar check-box medical source statement as the one in December 2010. He indicated that in making occupational adjustments, Plaintiff was poor at responding appropriately to changes, dealing with work stresses, maintaining regular attendance, and completing a workday and workweek without psychologically-based interruptions, but was at

8

least fair at following work rules, using judgment, responding appropriately to changes, dealing with the public, relating to co-workers, interacting with supervisors, functioning independently without supervision, and working in coordination with others (Tr. 471). Her ability to maintain concentration for extended periods improved from poor to fair (Tr. 471). In intellectual functioning, Dr. Sargious indicated that Plaintiff was poor at understanding, remembering, and carrying out complex and detailed job instructions, but was fair at understanding, remembering, and carrying out simple instructions (Tr. 472). In making personal and social adjustments, Plaintiff was fair to good at maintaining her appearance, socializing, behaving in an emotionally stable manner, relating predictably in social situations, managing funds/schedules, and leaving home on her own (Tr. 472).

## IV. SUMMARY OF TESTIMONY

On July 3, 2012, Plaintiff appeared at a hearing before the ALJ. Plaintiff testified that she lived in an apartment with her husband and two children, ages two and four, whom she had adopted (Tr. 44). She stated that she had poor reading, writing, and arithmetic abilities, but she completed the ninth grade in regular education classes (Tr. 46). Her husband managed their family bank account (Tr. 46-47).

Plaintiff stopped working as a factory worker in 2006 after a motor vehicle accident (Tr. 47-48). Plaintiff testified that since the accident, she has experienced back and leg pain, mostly on the left side (Tr. 52). She had been taking Oxycodone since 2006 (Tr. 53), which was effective in reducing her pain (Tr. 54-55). She testified that her pain is a four on a ten-point scale when she takes her medication; she experiences a spike in pain five days a week, which her medication relieves (Tr. 55-57). She also allegedly gets dizzy because of the trauma from the accident, but she has never fallen, it happens only weekly, and it lasts only one minute at the most (Tr. 53-54, 57). Plaintiff

fractured her left arm in the accident, which affects her ability to reach overhead, but she has no limits in handling or fingering (Tr. 58-59). She testified that she can lift up to ten pounds (Tr. 59). She stated that she used to use a walker and a TENS unit, but she does not any more (Tr. 60). Plaintiff testified that she is able to drive (Tr. 57-58).

Plaintiff sees a psychiatrist for depression four times per year in order to get medication (Tr. 62). She testified that she feels worthless, but she has not attempted suicide, and she no longer has suicidal thoughts (Tr. 63-64). She experiences crying spells only about once a month (Tr. 64). She testified that she also has concentration problems (Tr. 64).

Plaintiff testified that her twenty-four year-old daughter helps her care for her younger children (Tr. 64-65), but she later stated that her daughter comes over to help only every other day (Tr. 72). Her daughter bathes the young children, and her husband cooks for them (Tr. 65). Plaintiff can push the vacuum, but she needs someone to place it down for her (Tr. 67). She has no problems caring for herself, including taking a shower or shaving (Tr. 68). She testified that she can walk/stand for a half hour at a time, and sit for forty-five minutes at a time (Tr. 69).

Thereafter, the vocational expert (VE) testified that Plaintiff has past work experience as a housekeeper, a sander, and a greeter, performed at the light to medium levels of physical demand (Tr. 76). Assuming a hypothetical considering an individual of Plaintiff's age, education, and work experience limited to sedentary exertional work, occasional climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, no balancing, occasional stooping and crouching, no crawling, frequent left arm overhead reaching, simple, routine and repetitive tasks, no more than occasional changes in the work setting, no production rate or pace work, no strict or fast-paced production requirements (although competitive production requirements will still exist), and no more than occasional interaction with the public and co-workers, the VE testified that the individual could not perform any

10

past work, but could perform work as a surveillance system monitor, a telephone information clerk, and a parking lot attendant (Tr. 77-79). If, additionally, the same individual would be off-task about twenty-five percent of the work period, the VE testified that there would not be any jobs in the national economy that she could perform (Tr. 80). If the hypothetical individual were restricted by the limitations listed in Dr. Piszel's assessment (i.e., lift ten pounds occasionally and five pounds frequently, stand and sit a total of one hour each in an eight-hour workday), the VE stated that there would be no work available (Tr. 84-85). If the hypothetical individual, due to medical conditions, were to miss work more than one day a month, the VE testified that employment would be precluded (Tr. 85-86).

## V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c) and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id.,*

*Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

### VII. ANALYSIS

Plaintiff raises one issue as to whether substantial evidence supports the ALJ's decision that Plaintiff retained the residual functional capacity to perform a limited range of sedentary work.

First, the Court finds that substantial evidence supports the weight that the ALJ gave to the medical opinions. 20 C.F.R. Section 404.1527. Only treating source opinions that are "well supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record" are given "controlling weight." *Id.* Opinions that are not well supported or are inconsistent with the record are given less weight. 20 C.F.R. Section 404.1527(c)(2); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006) (en banc) ("[T]he Secretary is not bound by the treating physician's opinions, and such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence."). If the opinion is not given controlling weight, then the ALJ should evaluate the opinion under the Section 404.1527 factors, including the treatment relationship, the physician's specialty, and the opinion's supportability and consistency with the record. 20 C.F.R. Section 405.1527(c).

The record supports the ALJ's decision to give Dr. Piszel's opinion little weight. Among restrictions, Dr. Piszel opined that Plaintiff could only stand/walk one hour and sit one hour in an eight-hour workday (Tr. 476).

Initially, the ALJ stated that Dr. Piszel's opinion was based on Plaintiff's subjective complaints, and the ALJ explained why those complaints were not credible (Tr. 30). The ALJ stated that Plaintiff's alleged chronic pain was not supported by any observable manifestations, such as muscular atrophy, spasms, prolonged bed rest, or adverse neurological signs (Tr. 28). Furthermore,

13

Plaintiff presented no significant clinical or medical findings that would support her claim of crippling pain (Tr. 28). Plaintiff never received an MRI or other diagnostic imaging during the relevant period.

In addition, the ALJ correctly found that the examination records "were predominantly benign with pain reported an average level of four out of a possible of ten and stable gait"(Tr. 28). Dr. Piszel's notes state that Plaintiff's condition was stable, with full and equal pulses, no cyanosis or edema, and no clubbing (*see supra* at 4-5). Furthermore, the ALJ discounted Plaintiff's credibility because "the treatment has been essentially routine and/or conservative in nature" (Tr. 28). Further, Dr. Piszel's treatment notes show that Plaintiff did not use a cane or walker (*see supra* at 5-6). Also, the evidence shows that Plaintiff's treatment consisted entirely of pain medication, which she had been using since 2006, which has controlled her symptoms (*see supra* at 5-6; Tr. 53).

In addition, the ALJ found that Plaintiff's daily living activities contradicted her claim that she suffered from disabling limitations (Tr. 28). Plaintiff admitted that she drives and has significant childcare responsibilities (Tr. 28). Although Plaintiff testified that her daughter takes care of many of the responsibilities, Plaintiff admitted at her hearing that her daughter comes over to help only every other day (Tr. 72), and she told her psychiatrist in January 2012 that her daughter was moving far away (Tr. 474). Therefore, the fact that Dr. Piszel relied upon Plaintiff's subjective complaints, which the ALJ found were not credible, is a valid basis for the ALJ's not accepting Dr. Piszel's opinion.

Next, the ALJ discounted the weight of Dr. Piszel's opinion because he completed the report five months after Plaintiff's date last insured of December 31, 2011, approximately fourteen months after the last treatment note.

Also, the ALJ discounted the weight of Dr. Piszel's opinion because "his opinion is not consistent with the treatment records, which did not reveal severe pain or limitation of range of motion during muscoskeletal exam results: (Tr. 30). Hence, the ALJ correctly found that the examination records in the treatment notes "were predominantly benign with pain reported an average level of four

14

out of a possible of ten and stable gait" (Tr. 28). Dr. Piszel's notes correctly stated that Plaintiff's condition was stable with full and equal pulses, no cyanosis or edema, and no clubbing (*see supra* at 4-6).

Finally, the ALJ gave greater weight to the state agency physicians' opinions because they were supported by the record, which showed overall benign physical exam results and daily living activities that were not significantly limited (Tr. 29). Drs. Caldwell and Cruz concluded that Plaintiff could frequently lift/carry ten pounds, stand/walk two hours, and sit six hours in an eight-hour workday, and she had unlimited pushing/pulling abilities (Tr. 117, 132-133). Plaintiff could occasionally climb ramps/stairs, stoop, crouch, and kneel, and should never balance or crawl (Tr. 117-118, 132-133). In conclusion, the Court finds that substantial evidence supports the ALJ's decision to discount the weight of Dr. Piszel's opinion.

The Court further finds that substantial evidence supports the ALJ's decision to give little weight to Dr. Sargious' opinion, since it is not supported by the treatment notes, and is contradicted by the state agency consultants' opinions. The ALJ correctly found that "the mental health treatment notes, which consistently showed a stable or fair mood and good mental status evaluation results, do not support the opinions" that Plaintiff has poor mental abilities (Tr. 29; *see* Tr. 27-28). Dr. Sargious' examinations consistently showed that, as long as Plaintiff complied with her medication regimen, she exhibited a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (*see supra* at 6-9). The only treatment note that shows a significant spike in Plaintiff's depression was on October 5, 2009, when Plaintiff admitted that she had not taken her medication for ten days (Tr. 329).

Finally, the ALJ gave greater weight to the state agency physicians' opinions because those opinions were consistent with the record, which showed overall benign mental exam results and daily living activities that were not significantly limited (Tr. 29). Drs. Dietz and Rivera both found that

15

Plaintiff could have occasional contact with co-workers, supervisors, and the public, and she could perform simple, routine, repetitive, one- or two-step tasks that were not in a fast-paced environment and involved relatively few workplace changes (Tr. 98, 111, 132). Hence, the Court finds that substantial evidence supports the ALJ's decision to discount the weight of Dr. Sargious' opinion.

Also, substantial evidence supports the ALJ's decision to discount Dr. Degli's opinion (a one-time consultative examiner) that Plaintiff had across-the-board marked mental limitations.

The ALJ explained that Dr. Sargious' treatment notes contradicted Dr. Degli's findings of marked limitations and Plaintiff's claims of significantly impaired functionality. Dr. Sargious' examinations consistently showed that, as long as Plaintiff was compliant with her medication, she exhibited a stable mood, reactive affect, coherent and spontaneous speech, adequate insight and judgment, good impulse control, and no overt psychosis or suicidal thoughts (*see supra* at 7-10).

Plaintiff also reported during these visits that she was experiencing good sleep, energy, and motivation, and she was able to care for her adopted daughters (Tr. 436, 437). The only treatment note that shows a significant spike in her depression was on October 5, 2009, when Plaintiff admitted that she had not taken her medication in ten days (Tr. 329).

Dr. Degli's opinion was also contradicted by the two state agency physicians' opinions. Drs. Dietz and Rivera, who both found that Plaintiff could have occasional contact with co-workers, supervisors, and the public; and she was limited to simple, routine, repetitive, one- or two-step tasks that were not performed in a fast-paced environment and involved relatively few workplace changes (Tr. 98, 111, 132). Hence, the Court concludes that substantial evidence supports the ALJ's decision to give less weight to the opinion of Dr. Degli, a one-time consultative examiner.

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision.

16

Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a limited range of unskilled sedentary work that exists in the national economy, and, therefore, she was not disabled.  Hence, she is not entitled to DIB.

Dated: October 22, 2104                              */s/George J. Limbert*
                                                     GEORGE J. LIMBERT
                                                     UNITED STATES MAGISTRATE JUDGE